The STATE of Montana, ex rel., ROBERT J. BAILEY,
Plaintiff and Respondent, v. A. C. GRANDE, Jr., Fred
L. Hill, Jack D. Shanstrom, Mons L. Teigen ex al., De-
fendants and Appellants.

No. 11710.
Submitted December 10, 1969.
Decided February 16, 1970.
Rehearing Denied March 4, 1970.
465 P.2d 334.

438

Robert L. Woodahl, Atty. Gen., Hughes & Bennett, Michael J. Hughes argued, Helena, for appellants.

Hutton, Schiltz & Sheehy, John C. Sheehy argued, Billings, for respondent..

MR. JUSTICE HASWELL delivered the Opinion of the Court.

Defendants, the Board of Administration of the Public Employees' Retirement System, disallowed relator's claim for an occupational disability retirement but granted him an ordinary disability retirement. The district court of Lewis and Clark County, on the same record, found that relator was entitled to an occupational disability retirement and entered final judgment

in the form of peremptory writ of prohibition requiring the Board to desist and refrain from proceedings other than to grant relator an occupational disability retirement. Defendant Board appeals from the district court's finding of fact and conclusions of law, its refusal to amend or modify the same, and its final judgment.

Plaintiff is Robert J. Bailey, an employee in the Billings office of the Montana State Employment Service. He will be referred to herein as relator. Defendants are 5 individuals comprising the Board of Administration of the Public Employees' Retirement System of the State of Montana. Defendants will be designated herein as the Board.

The board issue in the instant controversy is whether relator is entitled to an "ordinary disability retirement allowance" or an "occupational disability retirement allowance" under the Public Employees' Retirement Act. The substantially greater amount payable under the latter allowance highlights the importance of the instant case both from the standpoint of relator and the entire Public Employees' Retirement System.

Relator commenced his employment with the Montana State Employment Service in July 1953. Throughout the next 14 years he was employed by that agency in various positions in its Billings office, and at the time of his termination he held the position of interviewer with a final employment salary of $740 per month.

Until sometime in 1964 or 1965, relator's work record was satisfactory and his health was good. However, at that time relator began to experience difficulty in getting along with his fellow workers and supervisors. At approximately this same time the work load of the office was increased by the implementation of several new programs without a commensurate increase in the number of employees. In the words of relator's supervisor, he began to develop a "persecution complex", and he complained of over-supervision. These reactions and attitudes, according to relator, were the result of his working con-

ditions, increased work responsibilities, and job discrimination.

In an effort to correct the difficullties experienced by relator, interdepartmental transfers were arranged, new positions were found, and an effort to improve his working conditions was made, all to no avail. Relator's problems continued, there was a noticeable change in his personality and an increasing difficulty on his part in getting along with his fellow employees and supervisors.

At one point relator offered to resign from his position, but his supervisor told him he was not seeking his resignation. Relator's problems continued to grow worse, and in November 1966, he was warned by his supervisor that unless he changed his attitude and ways, he would receive an ''unsatisfactory'' rating on his year-end report. Such a rating frequently results in termination of employment. Relator promised to try and improve his situation and on that basis he received a ''satisfactory'' rating at the end of 1966.

The situation apparently did not improve because after again receiving a warning, relator was given an ''unsatisfactory'' rating in December 1967. Thereafter relator requested and was granted sick leave commencing about January 2, 1968. He received sick leave compensation until March 28, 1968, and thereafter received accrued annual leave pay until May 3, 1968. As a result of the unsatisfactory rating, relator's employment was terminated.

In February 1968, relator filed a claim for an occupational disability retirement allowance based upon job-related disability caused by adverse working conditions. An employer's report was secured by the Board and medical reports were submitted by Dr. Edward R. Hodgson of the Billings Mental Hygiene Clinic; Dr. J. H. Schaeffer, relator's family doctor; and Dr. E. H. Lindstrom of Helena, the medical consultant for the Board.

Dr. Hodgson reported that relator ''shows a tremendous amount of anxiety characterized by intense worry and feelings

of frustration and insecurity'', that such ''anxiety reaction'' was of recent origin and apparently ''the working condition has had much to do with the development of these ''symptoms'', and that relator ''is not able at this time to continue with the type of work he has been doing and certainly he is not prepared at this time to embark on a new career.''

Dr. Schaeffer, the family physician, submitted a diagnosis of ''anxiety reaction'' with probable permanent disability. Under ''contributing causes of disability if due to employment'' Dr. Schaeffer indicated ''none'', while under the heading of ''Remarks'' on the reporting form, he stated ''I concur fully with the letter written by Dr. Hodgson on January 26, 1968.'' More will be said later of this self-contradictory report.

The Board referred the matter to Dr. Lindstrom who advised them that ''It appears that this man is disabled. However, as there is no connection with his employment, he would only be eligible for an ordinary disability retirement.''

Relator's file was reviewed by the Disability Claims Committee of the Board which recommended that relator be granted an ordinary disability retirement allowance. This recommendation was accepted by the Board at its monthly meeting in March 1968. Relator refused to accede to the decisions of the Board and requested a reconsideration of his claim.

Thereafter affidavits were submitted by relator to the Board from Dean Woods, a friend, and Rosemary Bailey, relator's wife. These affidavits indicated that relator's anxiety and disturbance was of recent origin and was job-related. At the Board's request, the Retail Credit Company of Billings conducted a claim investigation consisting of interviews with 4 co-workers, a residential neighbor, and a neighborhood merchant. Most of these interviews tended to establish that in the last 3 or 4 years relator had become high strung, nervous, irritable, and short tempered due to the pressures of his work.

Additionally, Dr. Schaeffer was queried as to the apparent discrepancy in his report referred to previously. Dr. Schaeffer

responded by handwritten notation at the bottom of the letter of inquiry—"sorry I misunderstood this question". He also returned a new form correctly filled out. This corrected new form showed in answer to the question "Contributing causes of disability if due to employment", "difficulty getting along with supervisors and co-workers". The corrected form also showed that he fully concurred with Dr. Hodgson.

Dr. Lindstrom, after being apprised of this change in Dr. Schaeffer's report and the Retail Credit Company investigation, was asked for a reevaluation by the Board. Dr. Lindstrom then reversed himself and found relator eligible for an occupational disability retirement allowance. His report reads as follows:

"I reviewed the inspection report on the above. It appears possible that because of some inadequacy on the part of the claimant that his work became an impossible task resulting in a nervous breakdown characterized by the change in personality and so forth. Dr. Schaeffer diagnosed it as an anxiety reaction. This is a border line case. Work which was to (sic) taxing for him mentally could certainly have aggravated a psychiatric problem.

"He seems to be normal while away from work according to the report. I would, therefore, have to reconsider and give him the benefit of the doubt and thus consider him eligible for an industrial disability retirement."

Thereafter, at the Board's request, relator was examined by Dr. Theodore Chemodurow, a Billings psychiatrist, on 5 different occasions during the first half of May 1968. Dr. Chemodurow submitted a report to the Board on June 26, 1968, containing a diagnosis of (1) "000-x52 Passive-aggressive personality", and (2) "?y00-005 Malingerer". Dr. Chemodurow's overall opinion can be summarized in the following manner: (1) Relator is not disabled and is capable of returning to work now. (2) Relator has no physical, emotional, mental or psychiatric impairment that would prevent him from working if he so

desired, (3) Relator's complaints are deliberately magnified relative to his stated difficulties.

Thereafter the Board held a formal hearing in Billings on August 16, 1968, before District Judge Jack Shanstrom, a board member, who presided as hearing officer. Testifying on behalf of relator was the relator himself and Clarence H. Nybo, the manager of the Billings office of the Montana State Employment Service; Dr. Chemodurow testified as a witness for the Board. Exhibits admitted were the entire Board file, a U. S. Civil Service Commission notice that relator had taken the civil service examination in 1968 for ''Mid-Level Positions'' and was declared ineligible ''because of nervous condition'', and a letter from Dr. Hodgson to relator's counsel covering a further examination of relator on June 20, 1968, indicating that relator's symptoms of anxiety was job-related.

Subsequently on September 20, 1968, the Board reaffirmed its award of an ordinary disability retirement allowance and its denial of an occupational disability retirement allowance.

Thereafter on November 26, 1968, relator commenced an action in the district court of Lewis and Clark County seeking an alternative writ of mandamus or other appropriate writ commanding the Board to grant him a occupational disability retirement allowance of 50% of his final compensation (subject to any credits to which the Board is entitled under the Public Employees' Retirement Act), or to show cause why it should not do so. This would amount to approximately $340 per month in relator's case (as he was gainfully employed in other than State service) as contrasted to approximately $130 per month relator would receive under an ordinary disability retirement allowance.

The matter came on for trial on January 2, 1969. No further testimony was taken and no additional evidence was considered. The district court considered the matter only on the record before the Board.

The district court entered its findings of fact and conclusions

of law therafter. In essence the district court found that relator became totally disabled by reason of disability resulting from injury or disease arising out of and in the course of his employment and was entitled to an occupational disability retirement allowance under the Public Employees' Retirement Act; that the record before the Board established this and "there is no evidence otherwise before the Board or before this Court"; that the Board is without jurisdiction to offer relator an ordinary disability retirement allowance; and that the Board disregarded the evidence and arbitrarily, capriciously and willfully refused relator the occupational disability allowance to which he is entitled.

On the same date, April 2, 1969, the district court entered judgment granting a peremptory writ of prohibition commanding the Board "to desist and refrain absolutely from any proceedings in the premises other than to grant to Relator a retirement allowance of fifty per cent (50%) of his final compensation (subject to any credits to which the Board may be entitled)". Subsequently the district court denied the Board's exceptions to certain of its findings of fact and conclusions of law, the Board's motion to amend such findings, and the Board's motion to amend the judgment. The Board now appeals from such denial and from the final judgment of the district court granting the peremptory writ of prohibition.

The issues assigned by the Board for review upon this appeal can be summarized as follows:

(1) Did the Board act arbitrarily, capriciously, or abuse its discretion in denying relator an occupational disability retirement allowance?

(2) Did the district court substitute its judgment for that of the board and thereby err in its findings of fact and conclusions of law?

At the outset we are confronted with the fact that there is no statutory provision for review of the Board's decision by either the district court or this Court. Nonetheless, courts

have inherent power to review the actions of administrative agencies, as here, by extraordinary writ. However, in so doing, the district court cannot substitute its judgment for that of the Board on the question of whether disability arose out of and in the course of relator's employment, (State ex rel. Sanders v. (Hill) P.E.R.S., 141 Mont. 558, 381 P.2d 475) although it may review the Board's findings to determine whether the Board has acted arbitrarily, capriciously, or whether it has abused its discretion in relation to relator's claim. (cf. 2 Am.Jur.2d Administrative Law, §§ 620, 650). In other words, the district court may determine whether due process of law has been afforded a claimant; it cannot usurp the duties and powers invested in the Board by law. (cf. section 68-901(i), R.C.M.1947.)

Although the law makes no provision for any appeal to, or review by the courts and does not require that the Board enter formal findings of fact and conclusions of law, it does require that the Board make an honest judgment, based upon the evidence before it. If the Board does this, its judgment may not be overturned merely because a reviewing court would have, or could have, reached a contrary result upon the same evidence.

Here the Board, by granting relator an ordinary disability retirement allowance, necessarily found that he was incapacitated for the performance of his duties and that he had 10 years of service with the state. It should be noted here that section 68-901(i), R.C.M.1947 as amended, provides that it is only when incapacity for performance of duty is "the result of injury or disease arising out of and in the course of his employment", that the member is entitled to an occupational disability retirement allowance at half his final compensation.

Directing our attention specifically to the first issue assigned for review, viz. did the Board act arbitrarily, capriciously, or abuse its discretion in denying relator an occupational disability retirement allowance? Section 68-901(i), R.C.M.1947, the statute governing such allowances, reads as follows:

"(i) Any member who has not reached seventy (70) years of

age shall be retired for disability if incapacitated for the performance of duty as the result of any injury or disease arising out of and in the course of his employment. Incapacity for performance of duty shall be determined by the board of administration of the public employees' retirement system, and said board of administration shall determine whether such incapacity is the result of injury or disease arising out of and in the course of employment. In the discharge of its duty regarding such determination, the board or any member thereof or duly authorized examiner or other duly authorized representative of the board shall have the power to conduct hearings, administer oaths and affirmations, take depositions, certify to official acts and issue subpoenas to compel the attendance of witnesses and the production of books, papers, correspondence, memoranda and other records deemed necessary as evidence in connection with a claim for disability retirement. If the board determines on the evidence that it obtains and application filed that the disability resulted from injury or disease arising out of and in the course of employment, the said member shall be retired forthwith and be paid the benefits provided under the retirement system. Any such member incapacitated for the performance of duty by reason of a cause not included in the immediately preceding sentence, and any other member so incapacitated, regardless of the cause, shall be retired forthwith regardless of age but only after ten (10) years of service to the state, or to the contracting city."

We note in passing that the Public Employees' Retirement Act as it existed after the 1967 amendment as set forth in Chapter 227 of the 1967 Session Laws, is controlling in the instant case.

Thus it is clear that the Board must make its finding "on the evidence that it obtains and application filed". So the first issue for review essentially boils down to whether there was substantial credible evidence before the Board on which the Board could base its denial of an occupational disability retire-

ment allowance to relator. If so, the Board cannot be said to have acted arbitrarily, capriciously or abused its discretion; if not, the converse is true.

The record is replete with evidence that relator is incapacitated for the performance of duty and thus subject to disability retirement. The medical opinions of Dr. Hodgson, Dr. Schaeffer and Dr. Lindstrom are clear on this point and furnish substantial credible evidence on which the Board could so find. The fact that Dr. Chemodurow expressed a medical opinion to the contrary merely creates a conflict in the evidence. The Board simply resolved that conflict as it was its duty to do.

The chief dispute in the instant case is whether there was substantial credible evidence before the Board to support a finding that relator's disability was not "a result of any injury or disease arising out of and in the course of his employment".

Relator argues that the act recognizes mental incapacity as well as physical incapacity as a basis for disability retirement, citing section 68-901(j), R.C.M.1947, as amended, and section 68-1001 in support. We have no dispute with this assertion. Be that as it may, it does not reach the problem in the instant case. The problem here is whether or not relator's mental incapacity was the result of an "injury or disease arising out of [or] in the course of his employment" within the meaning of section 68-901(i), R.C.M.1947, as amended. Clearly there was no "injury" here, so the question becomes one of disease.

Relator cites the following definition of "disease" in Maloy, Medical Dictionary For Lawyers, 2d Ed.1951:

"*disease* (diz-ez' [Fr. *des,neg+aise*, joy, gladness, ease, convenience, comfort, pleasure]. Any alteration or separation from health; illness; sickness; a particular affection or malady having special symptoms. An abnormal state of the body which interrupts or disturbs the vital functions.  *  *  *"

This is certainly one meaning of "disease", albeit a broad one. Other definitions taken from medical dictionaries are more restrictive, e.g. "An illness or sickness. A disturbance in function

or structure of any organ or part of the body."_Blakiston's New Gould Medical Dictionary, 1st Ed. 1953. However, the question confronting us here is what the legislature meant when it used the term, i.e. what was the legislative intent?

Whatever the legislature may have intended by the term "disease", it is clear to us that they did not mean to cover personality disorders, anxiety reactions, or difficulties in getting along with one's supervisors or fellow workers. In short, an employee that proves to be a square peg in a round hole is not entitled to occupational disability retirement on the basis of "disease arising out of and in the course of his employment". Were the law otherwise, any malcontent employed by the state could voluntarily at his option qualify for an occupational disability retirement allowance on the basis of inability to get along with his supervisors and fellow workers rendering the requirement of "injury or disease arising out of and in the course of his employment" meaningless.

Here there simply was no evidence of "disease" within the meaning of section 68-901(i), R.C.M.1947, as amended, and accordingly the Board was justified in refusing relator an occupational disability retirement allowance for failure of proof of this essential requirement. Thus the Board's action cannot be said to be arbitrary, capricious or an abuse of discretion but on the contrary fully justified by the record before it.

What has been said heretofore answers the second issue for review herein, viz.—did the district court substitute its judgment for that of the Board and thereby err in its findings of fact and conclusions of law?

While the district court here reached an opposite conclusion, its judgment cannot be substituted for that of the Board. In any event, there simply was no evidence of "disease" within the meaning of section 68-901(i), R.C.M.1947, as amended. Accordingly the district court's findings of fact, conclusions of law, and judgment granting peremptory writ of prohibition cannot stand.

The judgment of the district court is reversed and the cause remanded with directions to dismiss the action thereby allowing the Board's original determination to stand.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES JOHN C. HARRISON and CASTLES, concur.

The HONORABLE LeROY L. McKINNON, District Judge sitting for MR. JUSTICE JOHN W. BONNER, (dissenting).

I respectfully dissent from the foregoing majority opinion.

Dr. Hodgson reported that relator "shows a tremendous amount of anxiety characterized by intense worry and feelings of frustration and insecurity", that such "anxiety reaction" was of recent origin and apparently "the working condition has had much to do with the development of these symptoms", and that relator "is not able at this time to continue with the type of work he has been doing and certainly he is not prepared at this time to embark on a new career". See foregoing opinion.

Dr. Schaeffer, the family physician, submitted a diagnosis of "anxiety reaction" with probable permanent disability. See foregoing opinion. By error, Dr. Schaeffer indicated no job connection, but later corrected this. At all times he indicated full concurrence with Dr. Hodgson's report.

Dr. Lindstrom advised the Board relator was disabled, but by reason of Dr. Schaeffer's report of "not job connected" that he would be eligible only for ordinary disability retirement. He later, after being appraised of the correction in Dr. Schaeffer's report, found relator eligible for an occupational disability retirement allowance.

Three doctors found job related disability. One doctor found no disability. I would find no credible evidence to support the judgment of the Board. Dr. Chemodurow's testimony would not support any disability retirement. The findings of the other three doctors would support only an occupational disability retirement. I would, therefore, sustain the district court judgment.

.

The majority opinion seems to go beyond this, however. They say in interpreting section 68-901(i), R.C.M.1947, as amended:

"Whatever the legislature may have intended by the term 'disease', it is clear to us that they did not mean to cover personality disorders, anxiety reactions, or difficulties in getting along with one's supervisors or fellow workers  *  *  *"

Dr. Lindstrom's report is quoted in the majority opinion, and I would here call attention to the second sentence thereof:

"*  *  * It appears possible that because of some inadequacy on the part of claimant that his work became an impossible task resulting in a nervous breakdown characterized by the change in personality and so forth  *  *  *"

It would appear to me that the personality disorders, etc., are symptoms. The disability seems to relate to the nervous system, whether a "breakdown" or not. I would point out that in 1968, the year that Dr. Chemodurow found no disability, relator took a civil service examination for "Mid-Level Positions" and was declared ineligible "because of nervous condition". Relator was on the job fourteen years. Testimony concerning his work, his willingness and his agreeableness, was all complimentary until the last couple of years, when these symptoms developed.

I would affirm the judgment of the district court.